PENNSYLVANIA LUMBERMENS MU-
TUAL FIRE INSURANCE CO.
et al., Appellants,

v.

J. K. NICHOLAS, d/b/a J. K. Nicholas
& Company, Appellee.

No. 18813.

United States Court of Appeals
Fifth Circuit.

Dec. 13, 1961.

George J. Baya, Miami, Fla., for appellant.

Wm. G. Ward, Louis M. Jepeway, Ward & Ward, Miami, Fla., for appellee.

Before TUTTLE, Chief Judge, and JONES and WISDOM, Circuit Judges.

TUTTLE, Chief Judge.

This is the second appearance of this case here. Our first opinion is to be found in 5 Cir., 253 F.2d 504. In the meantime, the case has been retried by the trial court without a jury and a judgment has again been entered in favor of the insured, Nicholas, and against appellants for substantially the same amount as awarded in the judgment previously appealed from.

The basic question before the court here, as it was earlier in the case, is what, if any, effect is to be given in the adjustment of a fire loss involving the valuation of part of the stock of goods only partially damaged by the fire, to information received by the insured and not communicated to the insurers prior to the furnishing of proof of loss that full or partial credit would be given to the insured for part of the stock of goods and which credit, when given later, amounted to considerably more than the apparent value of this salvage.

The facts that give rise to this question are substantially as follows: The fire occurred on November 10, 1948. Merchandise consisting of cigarettes, tobacco, candy and numerous other items which were immediately thought by appellees to be salvageable was removed within ten days or two weeks to a new location for protection. Later, other items also were moved for protection. On January 7, the insured made his proof of loss with inventory attached; the proof of loss assigned a value of $4,900 to the salvage. The insurance companies made some examination of the merchandise, but did not inventory it and they did not agree to take it at the $4,900 valuation. In the meantime, commencing the day after the fire, negotiations were commenced by the insured to cause his suppliers, notably cigarette companies selling nationally advertised tobaccos, to give him credit for the undamaged and partially damaged stock to prevent its being put on the market through salvage channels. Considerably before the date of the filing of the proof of loss, the insured had received written offers from several of the suppliers offering to give him credit for merchandise supplied by them, as and when it was returned to them in certain specified conditions. No knowledge of this fact came to the attention of the insurers until after testimony of the insured was taken under oath following submission of proof of loss. Thereafter, shortly after August 2, 1949, the insured actually received credits from his suppliers for items that were in the inventory of loss in the amount of $11,587.73.[1]

The appellant contended that as a matter of law the amount of the salvage was at least the $11,587.73 figure representing actual cash credits received by the insured plus some $1,500 actually received from the sale of additional parts of the inventory rather than the $4,900 valuation testified to by the witnesses on the trial. Appellants also contended that the policies were voided because of the conduct of the insured in not informing the insurers of the existence of such offers of credits and because of the inclusion in the proofs of loss of items that were not in fact destroyed or damaged in the fire. It was contended that these facts constituted fraud on the insurers which had the effect of voiding policies.

We dispose first of the special defense of fraud. The trial court on two occasions has found that there was not sufficient evidence of a willful or intentional concealment to constitute fraud. This, of course, is a question of fact as to which it is the primary duty of the trial court to make its determination. We cannot conclude that the decision of the trial court here was clearly erroneous. See Hartford Fire Insurance Company v. Haagar, 5th Cir., 196 F.2d 270.

Coming next to the question as to the significance of the credits later received

---

1. On the first trial this figure was spoken of as $12,179. On the second trial it appears to have been $11,587.73.

which, without dispute, yielded to the insured more than twice the amount which the court has allowed as the salvage value of the fire damaged inventory, we must consider what we have previously determined to be the law governing such situations. In our previous opinion, 253 F.2d 504, we perhaps oversimplified the statement of the legal question there involved by assuming that the case as it was there presented showed that immediately following the fire Nicholas had received definite assurances from his suppliers that they would allow him the $12,179.00 for part of the goods. What actually happened was this: Prior to the filing of proof of loss on January 7, 1949, the assured contacted several of his suppliers asking their position in relation to the damaged merchandise. The American Tobacco Company replied by requesting the return of all its merchandise and agreed "When all the goods are received at our factory credit will be issued in your favor for full value for all merchandise received intact with revenue stamps attached." The Phillip Morris Company offered "to accept the return of this merchandise and collect for your account the value of the internal revenue stamps which, in the case of cigarettes, is 7¢ per package and slightly over one-half of the net value of same." The Wrigley Company, Beech-nut Packing Company and Lifesavers Corporation offered the assured "full credit" for all damaged merchandise. Similar offers were made by other suppliers.

Now, of course, the assured did not and could not be expected to know that these offers would ultimately produce exactly $11,587.73 in credits. In this sense, the trial court was correct in concluding that there was no "outstanding assurance from any of these suppliers * * * either immediately after the loss or before the filing of the proof of loss, that if the insurance companies would not take such goods for $4,941.53, they (the suppliers) would take them at $11,587.73 or at $12,179.00 or at any other sum." However, by correlating the offers with the damaged merchandise included in his inventory after the fire, the assured could have translated the offers into a dollars and cents amount approximating the $11,-587.73 figure which he ultimately received. In other words, if the assured was offered 7¢ for each package of Phillip Morris Cigarettes with revenue stamps attached and the assured then had 100 of such packages in his possession, this would amount to an offer of $7.00 for that merchandise. Even if the assured did not then know that he had 100 such packages, this fact would not alter the conclusion that the assured had an offer of $7.00 for the cigarettes. Merely because an offeree may not know that exact quantity of merchandise which he has which will meet the terms of the offer does not destroy the existence or legal validity of the offer. Restatement, Contracts, Section 25 Illus. 3. In such a case the total contract price must necessarily be determined after the offeree has discovered how much of his merchandise can be delivered in accordance with the terms of the offer.

In the instant case, the assured could not know the exact amount of credits which he would receive until his suppliers examined the damaged merchandise and determined just what they would accept. Whatever merchandise they did accept they were bound to pay for in accordance with the terms of their offers. (i. e. "full credit", "7¢ per package", etc.). Merely because the amount of damaged merchandise which they would accept, and the total credits produced by their acceptance, was not determined until some time after the assured filed his proof of loss on January 7, 1949, that cannot vitiate the fact that the assured, in a very real sense, was offered $11,587.73 for the merchandise prior to January 7th. In light of this analysis, the trial court was incorrect in concluding that the assured had no outstanding assurances from his suppliers that they would take the damaged merchandise back and issue him credits approximating $12,000.

On the first appeal, we directed the trial court to receive evidence per-

taining to the offers received by the assured from his suppliers. In accordance with this direction, the trial court received in evidence the correspondence between the assured and his suppliers, but concluded, as noted above, that this correspondence did not produce any outstanding assurances from the suppliers that they would take the goods back for $11,587.73. We have already held that this was error. The question remains, however, as to the effect to be given the offers in determining the market value of the damaged merchandise.

With respect to this question, we stated, on the first appeal, that "the value of a stock of merchandise the day after a fire depends upon what those valuing it consider it can be expected to bring in the [open] market." 253 F.2d at 506. In making this determination, one authority in the field of damages has declared that:

> "Manifestly, since we are looking at value from the point of view of one who is complaining of being deprived of the thing valued, it is the *highest* price that he could have realized that we are seeking. The owner would have searched for those purchasers who would pay most for the property. * * * Likewise, if a high price for the property could actually have been secured at the time in question, this should be accounted its then market value * * *." McCormick on Damages, at pages 168–69.

■ Since, in our view, the assured could have realized $11,587.73 for the damaged merchandise had he returned it to the suppliers before he filed the proof of loss on January 7, 1949, we hold that $11,587.73 represents the true salvage value of the damaged merchandise.

The assured contends that, even if the damaged merchandise had a salvage value approximating $12,000, it cost him $8,600 to return the merchandise to his suppliers, thereby wiping out the difference between the $12,000 figure and his estimated salvage value of $4,900. After the fire, the assured moved his business and most of the damaged merchandise to a new location. Until October 1950, he continued to dispose of the damaged merchandise at the same time he was conducting business at this new location. The $8,600 figure was predicated on the assumption that it would have taken the assured four complete months to return the damaged merchandise to his suppliers if he had worked on this and nothing else after the fire. The assured figured his overhead, including rent, at $950 per month, and figured that his services and those of his assistants in connection with the return of the merchandise were worth $1,200 per month.

■■ In our opinion, the appellants must reimburse the assured for the expense of returning the damaged merchandise only to the extent that this expense includes (a) the freight cost of sending the merchandise back to the suppliers; the assured testified that this amounted to $330.74; (b) the cost of negotiating the offers with the suppliers, such as writing letters, sending telegrams, and including a reasonable allowance for the assured's services in relation thereto; and (c) overhead expenses and a reasonable allowance for the services of the assured and his assistants incurred with respect to the actual packaging and sending back of the merchandise to the suppliers. The assured was obligated, by express provisions of the insurance contracts, to "protect the property from further damage—forthwith separate the damaged and undamaged personal property, put it in the best possible order, furnish a complete inventory of the destroyed, damaged and undamaged property." Any expenses incurred in connection with the assured's discharge of this obligation are not recoverable in the absence of a provision in the insurance policies providing for such recovery. Puget Sound Lumber Co. v. Mechanics and Traders Ins. Co., 168 Wash. 49, 10 P.2d 568.

Unfortunately, our decision necessitates a further trial with respect only to the issue of recoverable expenditures. It

should be a short, and we hope, the final, trial in this case.

The judgment is reversed and the case remanded for further proceedings consistent with the views expressed in this opinion.